Our final case of the morning case is 118332118369 Jeff Gerba v. Community High School District No. 155. Are the appellants ready? Yes. Appellees ready? Yes. You may proceed. Good morning. Good morning. My name is Robert Sway. I'm here this morning on behalf of the Board of Education of Community High School District No. 155 up in Lake McKinley Counties. I'm here with counsel for our co-appellant, Ms. Stalter. I'm here on behalf of the Registrar's Superintendent for this consolidated action. We're here this morning on a consolidated appeal from the 2nd District. The 2nd District held that the School District No. 155 is required to follow the land use regulations of a local municipality, the City of Crystal Lake, a homeless municipality, where the school happens to be located. We're asking the court this morning to reverse that decision because we believe that the appellate court made a very serious error both in defining its own scope of what a public education looked like, and then after doing that, departing from two very important established lines of cases out of this court concerning both the authority of the General Assembly to exercise control over schools and school districts, and also concerning the regulation of regional agencies by local municipalities that are only a part of a subset of that larger region. I'd like to start with this. The 2nd District, in its opinion, came up with its own definition of public education. And without citing any kind of authority, the public education is simply the task of Under Article 10, of course, of the Constitution, public education is committed to the General Assembly. And the General Assembly has declared through the school code, which is a pretty significant code, what exactly it is that public education ought to look like. In this court, in cases such as people versus death, have looked at that and have held unequivocally that it is up to the General Assembly to determine what the system of public education should look like, that it is beyond the province, even beyond the power of the courts, to try to pass judgment upon what the best public educational systems ought to be and what the public education system ought to look like. And the reason for that, the court held, is because determining what public education ought to look like is essentially a practical decision. Determining what is best is a matter of policy for the General Assembly to determine under its constitutional power. It's not the kind of matter that can be argued in front of circuit judges and appellate courts where there can be questions of law as to what it ought to be. But 2nd District decided itself that the scope of public education just simply meant educating students and providing facilities for them. And then applied that, as you see, very narrowly throughout their career. After having done that, departing from the city of Peoria line of cases became very easy in 2nd District. The city of Peoria is a capstone in a number of cases coming out of this court, again, in which this court has held that the General Assembly has supremacy over the public school system and over public school districts, that it exercises all power by virtue of that power having been committed to the General Assembly in the Constitution. And so in the city of Peoria case, a home municipality wanted the schools to collect the local concessions tax. And they wanted both the schools and the local park district to make that collection. Are you saying the city of Peoria is dispositive of this case? I am, sir. I thought they said we need not decide whether health and safety ordinances of home rule cities are enforceable against school districts. Forgive me. So let me clarify. Yes, of course. So they did, of course, reserve the question of the city of Peoria as to this particular issue. So what I mean to say more accurately is all of the policies, all of the analysis behind city of Peoria are dispositive here. It compels the same result. All of the underlying constitutional considerations behind Peoria. So forgive me. This is, of course, not dispositive, but all of that consideration that went into that decision compelled the exact same result here. Mr. Swain, how are the local zoning laws similar or dissimilar to the tax laws in the city of Peoria? How is that analogous? They're actually more oppressive upon a public school district than local zoning laws. Or let's say land use regulations more generally because they call it the unified development ordinance. Crystal Lake. But, of course, the restaurant tax issue in the city of Peoria was simply a matter of collecting a tax on concessions that were already being sold, a transaction that was already being held, and then keeping books and then giving that tax to the city and remitting it over. That's just a simple pure administrative function. So the tax is dissimilar to the zoning laws? Yes, in terms of how oppressive, yes. It's much less oppressive than zoning. Is there a direct conflict between the school code and the city zoning ordinance? I don't know if there's a direct conflict between school code and the zoning ordinance, but I think the point is this, that by virtue of the constitutional considerations, it's up to the General Assembly to delegate jurisdiction over schools. And when they delegated jurisdiction over construction of school buildings and school campuses, they delegated jurisdiction very clearly to our regional superintendent. They delegated jurisdiction to the state fire marshal for the fire safety reviews. And they delegated jurisdiction to municipalities to review school plans for compliance with the Health Life Safety Code, which was adopted at the behest of the General Assembly. They did not provide, they did not delegate any authority to municipalities to enforce their zoning. So, from a policy standpoint then, if we accept your argument, school districts can ignore local zoning and stormwater management regulations? Let me clarify that just a little bit. I don't think this speaks necessarily to the school district as an entity. Although the City of Peoria decision might reach that result, what we are suggesting is that the nature of the property being used, the fact that it's being used for school purposes, is what drives the result. So, my suggestion is, property being used for school purposes, and thus by definition discharging an Article 10 function, is immune from any regulation that has not been authorized by the General Assembly. So, here we're dealing with doubling of bleachers, right? Doubling the size of bleachers? The example of the 20-story building, if you could justify it being school purposes, would that qualify? Well, we would have to convince the regional superintendent, because of course the school doesn't do this unilaterally either. But they would have that right. They would have that right. Yes, we'd have that right. Suppose they have an animal science class. Can they start raising livestock in the middle of the town? If the regional superintendent approves that. Raise 20 head of cattle? Cows? Listen, there's an agricultural high school in the south of Chicago. It's the last remaining working farm within the confines of the city. Again, that's the regional superintendent. You know, we have to find an authority to run a farm in the school code, and we have to get the approval of the regional superintendent. But if that authority has been granted in the school code, and we clearly have authority to establish and operate and maintain athletic facilities, and the facilities have been approved by the regional superintendent, then that is what the school code requires. And that's what the General Assembly requires. That's our position. In that case you referenced, did they not seek zoning? In which case, I'm sorry? City of Chicago and the farm in the city? I'll be honest, I don't know what the zoning implications are there. The ag school has been there for quite a while. Of course, the Chicago system is different than the rest of the downstate school districts, at least more recently. The school system there is actually an extension of the city itself. So I think the zoning implications within the city of Chicago might be different. Mr. Swain, we've taken a pro-home rule position, I would say, probably, in the cases such as Palm and StubHub. Do those cases affect your argument at all? Well, sure. I think you've got to look at it first. I mean, first my premise, of course, is matters that are committed to the General Assembly and to the State Board of Education by the Constitution just most naturally fall outside of a homeroom municipality's local government affairs. Sure, we apply the StubHub or Caledonia analysis. We look at it and recognize that the problem we need to address here, and you can look at it from a high level, from a low level, but at some level we must recognize that the problem involved providing facilities here for schools to operate. And whether we understand that in a very differential city of Peoria sense, that the General Assembly has got the absolute discretion to determine what schools may and may not do, whether we look at it and recognize that when schools are establishing facilities they need for education, when we are defining the problem under that step one of StubHub, we must realize that on any level there's an educational component here that has got those constitutional implications. So, yes, I think the second and third steps of StubHub effectively flow from defining that problem. I mean, if we define the problem only locally, as the city does, but the only problem here is considering the impact on the neighboring homeowners, well then certainly the city has got the traditional role in enforcing zoning within its jurisdiction. We have no dispute. We're not here to say that a municipality can't zone within its jurisdiction, but we are here to say that where property is being used for Article 10 purposes, it's under the exclusive dominion of the General Assembly. It does not fall under control of the municipality. The General Assembly has given to the school board the authority to seek zoning changes, variations, or special use for property held or controlled by the school district. Yes, ma'am. It certainly seems to suggest a relationship between the school and the municipality and their zoning laws. Well, yes, and it actually occurs. The second district misinterpreted that because in the second district's opinion, they called that a power and a duty that authorizes and requires the schools to go through zoning. But I think it's very clear as a matter of statutory construction, and I think the city concedes this, that there are certain provisions in the school code that are specifically designated as powers and other provisions that are specifically designated as duties. And this falls into the form. It is specifically designated as a power. And in fact, an act of the General Assembly just two years before the zoning provision was enacted changed that collection of provisions from duties to powers. And effectively, what the city is asking this court to do now is undo that legislative change and revert it back into a duty or to render it a duty. You haven't really asked the question. The sense of this is that there will be situations where the school board will choose to exercise that authority to seek zoning changes, and so therefore, they're not beyond the zoning laws of the municipality. And so yes, it happens. And let me provide two specific kind of examples where we've seen it happen. The first is property that's not being used for school purposes. So for example, a deactivated school that a school district is planning to sell off. And in fact, there was exactly such that case pending in Cook County when the statute was adopted. And in that case, the opponents who wanted to keep that school open convinced the circuit court of Cook County that the school board lacked the power to seek a rezoning of that property which they had obtained just to make it more marketable. But in that case, it was in the school district's interest to voluntarily rezone that property for the sake of making it more marketable. Second, you still have clients who have wanted to expand projects, expand campuses, but then might also encroach upon, say, a city's right of way. And as they approach the city to seek this kind of permission, cities have said, we would like this project to go through our zoning process in condition of us granting you that encroachment upon our right of way. Again, the school district has now got that power, which serves the school's interests, to participate in and even invoke that zoning process. But there's nothing in that provision that says municipalities can unilaterally impose zoning over the school's objection. That's the difference. The second line of cases, of course, is the displains line of cases. In displains, several public court decisions that have followed that, it's very clear that there's a fundamental concern with allowing one portion of a region to regulate a larger regional agency that is meant to serve that whole. And here we have a school district that serves some 10 communities situated primarily in McHenry County, but even partly in Lake County. And we have one municipality who happens to be the site of one campus, but even that campus serves students. From the Executive Seven out of those communities, students who are coming from outside of Crystal Lake to attend this campus, to use those facilities, to receive their public education to which they're constitutionally guaranteed. And as we look at that kind of dynamic, we understand these factors. This was even some analysis Professor Reynolds put in her brief. From even, say, a standpoint of political accountability, we want to make sure that the entity who's going to be making decisions about how that property is used is then politically accountable to the persons who are going to be affected by those decisions. In this kind of scenario, we have the Zoning Commission, the City of Crystal Lake, making decisions that are going to have extraterritorial impact upon students and families from five or six other communities. And those students and those families have no political remedy. The City of Crystal Lake, to be fair, has no reason to consider their interests. I mean, their interests are certainly to their own constituents. We have no dispute with that either. Except we need to point out the reality of their local focus, meaning that the interests of other students throughout the rest of the district who are served by this are nowhere being taken into account. I promise my co-counsel to preserve several minutes here for her at the end. She wants to address the issue from the perspective of the regional superintendent. No question for the court this time. I'll see you at that time. Thank you. Thank you. Good afternoon. My name is Lyle Stalter. I am on behalf of the Waterloo District. I'm sorry, Lake County State's Attorney, who is specially appointed to represent third-party defendant Leslie Skirmihorn, the McHenry County Regional Superintendent of Schools. Skirmihorn does not disagree with the school district in this case. However, the second district decision leaves her at a little bit of a loss. There's no indication as to how she is now to handle these particular matters. The school code is comprehensive with respect to what she is to do in reviewing the applications. When she gets an application that meets all of the requirements that she is to consider, she's required to approve it. And if she doesn't, the school district has the right to go to the state superintendent of schools to seek approval of that application. The codes additionally provide that once that application is approved, the school district is authorized to begin construction. And there are some very critical timelines there. If the school district does not start construction within six months, the permit becomes invalid, and then the process starts all over again. So there are some provisions within the school code that seem to address this. One is that if this court determines that the city is an entity with jurisdiction here, there are provisions that allow them to notify the school district and then have to certify to the regional superintendent that their provisions and their ordinances and regulations have been complied with. That step has not been taken in this particular case. Have they been notified? Were they notified before the construction? The notification requirement requires an affirmative step on behalf of the city. And there is no requirement that the school, once the city identifies to the regional superintendent that they are interested or it is interested in knowing about a construction project, then the regional superintendent has a responsibility to notify the jurisdiction of the application that is pending. How would they notify the construction project if the board doesn't tell the city? It would be a standing notification from the city to the regional superintendent that once she receives an application, that they would like to receive a copy of it for review with respect to the building code. So they always send the application into the city? No. The city has an affirmative duty pursuant to the school code to tell the regional superintendent that it has an interest in being notified of applications that she receives. That's an affirmative duty set forth in the statute. I'm sorry? Not vice versa. But the board or the district doesn't have to tell the city about the construction. They have to learn on their own. Is that it? The school code does not address how the school district or the board would notify the city. But the school code and the portions that the regional superintendent is required to enforce, if she has that request from the local jurisdiction or the city, then she is required to send the city a copy of the plans once they are received or notify the city that they are received. And that's... Counsel, just to follow up on Justice Burke's question to make sure I understand your answer, under the school code section 3-14.20, is that the section you're referring to? Yes. And I wanted to make sure I clearly identified that. And that's the one that says the entity referring to the municipality must register with the regional superintendent, et cetera, et cetera. And then if they've registered and it's on file, at any time in the future when there's building code specifications, then the regional superintendent must send it to the city. But absent that request, there's no obligation. Is that what you're... Yes, and that was what I was trying to indicate, is that the first affirmative duty is upon that city municipality. And once that registration is in place with the regional superintendent, she now has an affirmative duty to forward that information. There is nothing in the record to indicate that the city of Crystal Lake notified the regional superintendent that they had an interest in receiving copies or notifications of applications pending before them. So they never registered? The information that I have of record is no, that they had never registered with the regional superintendent. So that's just one of two possibilities for the city to be involved in a process where it would have jurisdiction. If you also look at Section 2-3.12 of the school code, there is a provision that talks about an entity or an agency with jurisdiction. And obviously that's a key element on the school district's positions. Their position is that they don't have jurisdiction. The regional superintendent is not objecting to that. But if this court determines that the city does have jurisdiction, they have the ability to notify the school district that they have jurisdiction and that its ordinances be complied with. And once those notifications are made, then they have to certify them to the regional superintendent that they've complied with those ordinances. And I apologize, I just noticed I have a red light. So the regional superintendent would request that the summary judgments be reversed. Thank you. May it please the Court. I am Victor Filippini of the Filippini Law Firm. I'm here on behalf of a third-party defendant in Appalachia City of Crystal Lake. I'll be splitting my time with counsel for the plaintiffs, Thomas Burney. And so that's why I have my stopwatch running. The Illinois Constitution makes clear that its objectives is to provide for the health, safety, and welfare of the people. Objectives so expressed come out with a series of policy goals that are set forth in the Constitution. These include education, but also a healthful environment, rights of due process, the protection of private property rights and remedies, and intergovernmental cooperation. This case addresses how to reconcile the myriad interests that we the people seek to promote through government. Fortunately, the legal issue in this case is easily resolved. The General Assembly has plenary power over schools, as it does non-home municipalities. The General Assembly has delegated certain powers to promote public health, safety, and welfare to local school districts, as it has to municipalities. Chiefly among those is the delegated power that the General Assembly conferred upon municipalities and counties. In granting powers to a local school district, the General Assembly expressly did not release the school districts from duties imposed by either the school code or, quote, any other law. Those other laws include zoning laws that the General Assembly has delegated to municipalities and counties. And in order to comply with zoning laws, the General Assembly has expressly authorized local school boards to seek relief from those laws through the established zoning procedures. Looking at the broad scheme of the General Assembly as a whole, it conferred local zoning power without exception or exemption to schools from zoning. But the General Assembly did empower the school districts to seek relief from those zoning regulations through the standard zoning procedures. The use of the local zoning process to reconcile the myriad policy goals of the more than 7,000 governments in Illinois are charged to pursue. This has been well recognized by the court and most prominently in the Wilmette Park District versus Village of Wilmette case. This court ruled that a park district had no immunity from zoning because it was not expressed in the statute. And instead, the park district was required to engage in the local zoning process so that the impact of the park district's activities on adjoining properties could be addressed. Using local zoning processes as prescribed in Wilmette Park District not only fosters the constitutional objective of intergovernmental cooperation, and this court in that case stated that intergovernmental cooperation is a two-way street. It cannot be used to thwart another local government statutory mission. With that in mind, it's easy to see that zoning and school district activities from a land-use perspective can be easily reconciled well within the confines of what the General Assembly has set out in its statutes. But that's not the end of the zoning process. This court, again, has expressed very clearly in cases such as People-X-Fell-Claren versus Village of Lyle that the local zoning process is also a mechanism for protecting the due process rights of nearby property owners. In light of the protection of local government's statutory mission that is provided for in the Wilmette Park District case and the many common interests that municipalities and school districts share for the enhancement of their communities, the risk to the legitimate educational mission of schools is not challenged by the local zoning process. Now, counsel for the school district had suggested that there is no such concern because the schools are covered by the life safety code. But school district's life safety code and the review of the regional superintendent do not supplant zoning. The General Assembly has clearly distinguished between building regulations on the one hand and zoning regulations. This is both in a matter of statutory grants and the structure of the code. Building regulations are a consistent, uniformly applied set of standards and the regional superintendent looks at what is proposed to be constructed on school grounds to ensure that those building standards are met. In contrast, zoning looks at the impact of a use of one property on nearby properties. As both the United States Supreme Court and the Illinois Supreme Court have recognized, zoning is contextual and it's based on circumstances and locality. Such considerations cannot be addressed in a single statewide code. And that is why zoning regulations have been delegated by the General Assembly to municipalities and counties. So a building may be safely constructed in any location in accordance with the school code's life and health safety code, but the adverse impacts of a particular use on an adjoining property can only be addressed contextually through the zoning process, not through building regulations. As Justice Sutherland observed in the landmark case of Village of Euclid v. Ambler Realty, zoning like nuisance laws is intended to prevent a right thing in the wrong place, like a pig in a parlor instead of a barnyard. District 155 tries to suggest that the difference between building and zoning regulations is just words, but the legal effect of words is what laws are all about and the effects cannot be disregarded because they are inconvenient to District 155. If we agree with you, is there a risk that parochial concerns might interfere with the state's authority to control education? I don't think so at all, Your Honor. First of all, the policy questions that come up are not policies that are dictated in the land use context, are not policies that are dictated from the State Board of Education or the General Assembly. These are local decisions made by local school boards as to what they're going to do. So these are not statewide concerns. These are local determinations. Secondly, what the zoning process does is not look at, well, what is the educational impact of this. It's an internal review, and that's something appropriately done by the school boards and the regional superintendent. What the zoning process does is say, what happens to this use when you look externally? It's that external impact, the adverse impacts to outside properties that is not part of the school code and is not part of the process either of the regional superintendent or the local school boards. That is a matter that the General Assembly has left to the competency of municipalities and counties. And it's that look of what is the impact on adjoining properties that the zoning process is all about. Now, is it possible that a municipality might decide, well, we're not going to stop there. We're going to start looking into the core issues of educational policy. It's possible. But your court has previously stated that there's a way of protecting against that, and that is if a municipality goes beyond reasonable regulations in a land use context. And as you all know, there are very well-established principles for evaluating land use decisions of localities. But if a municipality goes beyond that, not only are they subject to the substantive due process requirements set forth in LaSalle case and its progeny, but they are also subject to the Wilmette Park District case that if those actions have the effect of thwarting the mission of a school or any other local government, then they're going to be over the bums and they're going to be addressed in the courts. So is there a risk of a rogue municipality? Of course there is. But is there a process for handling it? Very clearly there is, and one that has worked effectively. Now, counsel for District 155 also suggested that there's another line of cases that says we have no business in this because localities aren't allowed to zone regional governments. Well, first of all, let's be frank. Under the school code, we have the State Board of Education, we have the regional superintendent, and we have local school districts. They may cross multiple boundaries, so too does the city of Crystal Lake. If you look at different governmental boundaries, it's a tapestry of boundaries, but each of them are local governmental units in their activities. And it's not whether or not they cross over boundaries. That just happens. It is whether or not they have a regional role that they take for the municipality. The cases that they cite, and I should note just for clarity, that the line of MSD cases, Metropolitan Sanitary District v. Des Plaines, there were three of them. The first one, the court said zoning powers do not prevent a regional government from exercising eminent domain powers. The second case, which was an attempt after home rule became effective in Illinois, was decided on race judicata grounds based on the first case. The third case did not involve zoning regulations at all, but environmental regulations, which under the Constitution were recognized as a statewide concern and addressed in the Illinois Environmental Protection Act. So this court has never said that regional governments are immune from zoning. But even if you take the RTA case involving the Pace Bus Yard in the city of Evanston, what that case involved was a government that the General Assembly established as regional in nature that was taking over responsibilities that municipalities otherwise had. And it's a matter of being all in. If a municipality was part of the RTA, they can't hold back some of their regulatory authority. Either they're in or they're out. And there's an opt-out provision in the RTA Act. Because Evanston was not opted out, they couldn't, on the one hand, take the benefits of the regional system and, on the other hand, try to control it independently of everything else. So those cases are fully distinguishable from this. There's been discussion in this case about home rule. And frankly, the home rule discussion is an unnecessary one. As your honors know, this court, if there's a way of resolving something without getting to a constitutional issue, should so resolve it. And this is something that can be fully and easily resolved by looking at the entirety of the Illinois compiled statutes and the way authority has been divided between schools and municipalities by the General Assembly. So you don't need to get to the constitutional issue. Nevertheless, if you get to the StubHub analysis as to the city's home rule powers, that clearly shows that this case was properly decided by the Second District. The nature and extent of the problem is purely local. The property is located in Crystal Lake. The impacts are all on Crystal Lake properties. It is essential character of zoning to be local. That is why the General Assembly has so delegated zoning powers to localities. The General Assembly could have conceivably exercised its own zoning powers from the statewide level or even delegated it to the State Board of Education. It didn't. It gave it to municipalities. They are the ones at the place where the action is. Likewise, when you're looking at zoning and the nature of its local impact and the local circumstances that give rise to whether or not it's proper, the impacts are clearly local, and the solution must be addressed locally. And historically, it's been local, as this court had noted in the Cook County v. Sexton case. So if you go through the home rule analysis, plainly the Second District was correct. There is also some thought that the educational goals of this state are singular in their purpose. I think that we all have a high value for education, but that doesn't mean that education can flaunt its importance by poking every neighbor in the eye. And that's where zoning comes in. And that's why we asked this court to follow what the General Assembly did in establishing the arrangement of local zoning authority over uses that occur within their boundaries. And Your Honors even asked some questions about the practical impact. If there were no zoning regulations, could there be a 20-story building? I see no reason why not. The question that counsel responded to, well, there's an agricultural school in Chicago. Well, there's a case that specifically says that the School Board of Education or the Chicago Board of Education is subject to zoning. That's the Hodges case that was cited in our materials. Unlike the Building Code or the Life Safety Code, zoning is a set of rules to manage a process. That process seeks to balance the broad land use goals of a community against the rights of property owners and the interests of nearby property owners. Community land use goals are important because they often dictate how community investments in infrastructure, such as water and sewer and roads, is dictated. The land use is endangered if the public infrastructure doesn't have sufficient capacity to serve it. The private property rights of owners and neighbors have similar importance but from different perspectives. It's managing these different respective interests that the zoning process takes care of. It's an inclusive process. It's subject to due process and notions of fundamental fairness. The zoning process is designed to address the due process concerns that the court has well developed and fully understands the standards for that. The school district's response to the constitutional due process concerns was that, quote, due process is a non-starter. While I would like to go into this, my co-counsel, Mr. Bernie, has much to say about it and has covered that fairly significantly. So if I might just ask that your honors consider the opinions of the circuit court and the appellate court, affirm them, and I will turn it over to Mr. Bernie. Thank you, counsel. We couldn't bring you to Crystal Lake, so we thought we'd bring the bleachers to you. At least a picture of them. My name's Tom Bernie. I'm from the office of Zancone, Wright & Selden, and Crystal Lake. As my friends put the pictures up, I'll get started. And you represent? I'm sorry, I represent Jeff and Kim Gerba, and I represent Lou and Jean Bianchi, who are adjacent landowners who live adjacent to the structure that you see before you. The question that the neighbors have asked to put before you, that we've put before you, is can an adjacent landowner who lives next to school property, or where the school claims that it's constructing a structure for school purposes, can it be totally denied the opportunity of fundamental rights of due process? And we say that the answer is no, that the due process commands that adjacent neighbors be given this opportunity. The pictures on your left show from the deck of an adjacent property owner what the bleachers looked like before they constructed. The picture on your right shows the picture from the same deck after they were constructed. The pictures hardly tell the story. They're 39 feet from my client's property. That is from about the cork side of the bench to the back of the wall. They're 40 feet in height plus another 10-foot press box. When you walk into this courthouse through the front doors and you look to the top of the pillars, that's as high as this structure goes. And when you look at this entire building, this magnificent building, that's the length of this structure that the school district chose to put adjacent to my client's property. This is 24-7, for 21 months it's been living with this. The appellate court, when it was criticizing the tortured construction of Article 10 of the Constitution, indicated that the school district looks at the school code as being able to do whatever it wants, whatever it pleases on its property. I would ask the court to say that right from the beginning of their brief, they say this is an issue of first impression. Yet what that is is an admission that there is no authority to allow the school district to do what it did here. There is no court in this state that has ever held that a school district can ignore the zoning ordinances of its host municipality. This was constructed a year after the Attorney General, at the request of the state superintendent of schools, requested an opinion as to whether or not schools are subject to local zoning. In a well-reasoned opinion, the Attorney General said, schools are subject to local zoning. They say it's a case of first impression, but one has to question, why didn't they seek a declaration of rights before the local court? Why didn't they give the city or the property owners an opportunity to go into court and join this before it got started? They've spent a million dollars on it. The fundamental flaw is that they have failed in their myopic view about Article 10 to consider the Bill of Rights in Article 1, Section 2. This court has been firm about the authority of adjacent neighbors to have due process rights. Your decision in Pasolino, while it was not a unanimous opinion, you all agreed that the constitutional framework of the right to notice, the right to be heard, the right to present your objections, that all of those are fundamental, and yet the school district's position is completely inapposite to this. And the school district says it's beside the point. The due process is beside the point. It's a non-starter is what they say. I don't know how often applets talk about the due process clause as being a non-starter, but it's not like they should be a stranger to the due process clause. This court in East St. Louis, when it did that wonderful analysis of what process is due, found that school districts are subject to the due process clause of the Constitution, so there is no question about that. We believe that this structure is a testament to the absurdity of the position that the school district has taken with respect to its rights and its excuse for following the zoning laws of local municipalities. We asked the court to affirm the judgment of Judge Camille Below. We asked the court to affirm the judgment of the second district appellate court, not only on the grounds that were advanced by them, but also on the grounds that fundamentally the statutory construction principle that they're taking offends the due process clause of the state Constitution. And finally, on behalf of my clients, I want to thank all of you for hearing this matter this morning. Thank you, counsel. I'd like to make several quick points here in rebuttal. We get it. We understand. The glitches are large. There was a process before they were built. They chose not to participate. There was a process the city could have invoked to review it. They chose not to participate as well. From a due process standpoint, of course, as we pointed in our briefs, the plaintiff's rights aren't an issue here. This is a third-party declaratory judgment action, simply seeking determination of what the rule of law is. Their rights are not being determined here. The fact that they have due process rights in a zoning hearing we have no quarrel with. The fact is that the question is whether zoning applies, such that the zoning hearing has to go forward in the first place. If zoning applies, it will be a zoning hearing. In fact, it's already occurred. They will have due process rights. They exercise those at the zoning hearing. We have no quarrel with any of that. But, of course, the discussion and analysis has to drive backwards. But what does strike me is this. Aside from creating its own kind of narrow-definition public education, the second district distinguished its claims by the case. It found that there was a distinct, quote, not in my backyard of those cases. It wasn't there. And my colleague has brought to you blown-up photos, literally, of his client's backyard to show you that this is the very kind of issue that was at issue in his claims in the Edison case, Jolly v. Snyder. This is the very kind of concern why we can't allow local municipalities to regulate out of their own parochial jurisdiction structures and facilities that are needed for the larger whole. As to the city's position, again, they defend the right to zone, and we have no quarrel with their right to zone. But all of their argument as to why zoning ought to apply to schools would make an excellent argument to the General Assembly. But under the city of Peoria line of cases, it is up to the General Assembly to decide whether schools should comply with zoning. And they have not done that. So I will concede almost everything my colleague has said about zoning. But that doesn't answer the point that the General Assembly has not required schools to follow zoning. The fact that there's a zoning statute authorizing municipalities to zone, that doesn't further the analysis. Municipalities have the power to tax. That didn't tell a result in Peoria. The Secretary of State has the power to regulate transportation. There's still an affirmative delegation by the General Assembly to the Secretary of State to regulate school buses. The State Fire Marshal has the right to inspect facilities. There's still an affirmative delegation in the school code from the State Fire Marshal as to schools. The paradigm under Article 10, under city of Peoria, is that all the power begins with the General Assembly, and any regulations or burdens that are going to be imposed upon the public education system can only stand if they are authorized by the General Assembly. And when the General Assembly decides to do that, we will adhere. But they've not done it here so far. Mr. Slane? Yes. I understand all the school code provisions that you've argued. Thank you. And we've discussed this one provision that was really an answer to a question by Justice Tice about the, as you clarified, a power of a school board to seek a zoning change or variances and so forth. But outside of that one specific statute that is in the school code, 10-22.13a, is there any other provision in the school code that says what you just said, that zoning does not apply to school districts? No, sir. But that's my point. There is no express preemption of home rule anywhere in the school code. Home rule is not mentioned anywhere. Well, put home rule aside. I just mean school districts versus a village that has a non-home rule village, for example. The next closest is not that. The next closest, though, in that 3-1420, says that their review of the plans must fall within the scope of the Health and Life Safety Code, which, as we have argued, means they cannot bring their own standards into play. But, no, there's no affirmative statute saying whether zoning absolutely does or does not apply. That, of course, would answer the question the General Assembly gave to us. But, no, there's certainly not. Finally, I'd simply like a couple points about the differences between schools and parks. We are certainly here to embrace intergovernmental cooperation. And, again, there's a process in 3-1420 that the General Assembly provided for intergovernmental cooperation where the municipality can be a part of the process in reviewing school plans. But the situation involving parks is very different than the situation involving schools. And that was actually part of the analysis in the City of Peoria case because both the school district and the park district were parties there, and the results differ. And the reason the results differ was because of the constitutional implications surrounding schools, none of which are a concern when it comes to parks. On a very practical level, we should consider this as well. There is, as we've discussed, within the school code, a statewide agency, the Illinois State Board of Education, a statewide code, the Health Life Safety Code that governs school construction. A regional official is not part of our school district. She oversees all the school districts in the county. A regional superintendent who enforces that code independently, a process by which municipalities can be heard to voice concerns on behalf of their constituents. None of that exists as to park districts. There's no statewide park district board. There are no regional park district officials enforcing regional park district codes where there's a separate hearing opportunity for municipalities as to park district plans. None of that exists as to parks. So in the absence of any of those alternatives, surely zoning is about the best option available. But when it comes to schools, because the General Assembly has plenary power, the General Assembly has already addressed much of this and created this paradigm within which this is all supposed to occur. Didn't we hear an argument, though, from the council for the superintendent that as long as the ducks are in a row, the application process is sufficient and the superintendent must act, in fact, a timeline to act? Did I hear that? Yes, yes, you did. You seem to indicate that somehow that's a protection in this case to, well, in this case to the homeowner. Where is the protection in that? Let's address this very briefly. The three things that we're concerned about here, height, size, setback, are addressed in the Health, Life, Safety Code, albeit in other ways, because they don't use zoning terms. There's a provision in the Health, Life, Safety Code that says the height of bleachers is unlimited. There's a provision in the Health, Life, Safety Code that says the size of bleachers is unlimited. And there's a provision in this Health, Life, Safety Code that says the regional superintendent must review and consider the location of a facility on a school campus in relation to improvements on neighboring property. That provision does not even actually set any kind of objective standards. So the regional superintendent has a chance to look at these bleachers, consider their size, see where they stand in relation to improvements on nearby property. Had they participated in the process, the city would surely then have the chance to say, that's much too close, because there are no standards set forth. So while there is some process going through, it's not just, say, checking math. I think there are subjective factors in there where the regional superintendent has some chance to exercise discretion, where there would be some opportunity for this kind of input to come into play. Thank you. With that, we thank the Court for hearing us. We look forward to your decision. Thank you, Counsel. Cases number 118332 and 118369, Jeff Gerber, et al., versus Community High School District Number 155, will be taken under advisement as Agenda Number 21. Mr. Slane, Ms. Stolper, Mr. Filippini, Mr. Burney, thank you for your arguments today. And Mr. Marshall, the Supreme Court stands adjourned until 9 a.m. tomorrow morning.